UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFICANS FOR A SCENIC COAST, et al., | Case No.  15-cv-02090-VC |
| Plaintiffs, | **ORDER ON SUMMARY JUDGMENT** |
| v. | Re: Dkt. Nos. 99, 101, 102 |
| CALIFORNIA DEPARTMENT OF TRANSPORTATION, et al., | |
| Defendants. | |

# INTRODUCTION

The California Department of Transportation has proposed widening part of Highway 1 in Pacifica, a coastal city south of San Francisco.  The area in and around the proposed construction site includes habitat for California red-legged frogs and San Francisco garter snakes, both of which are listed species under the Endangered Species Act.  Section 7 of the Endangered Species Act thus required Caltrans to consult with the Fish and Wildlife Service to ensure that the project would not jeopardize these listed species or their critical habitat.  As part of this consultation, Caltrans gave the Fish and Wildlife Service a Biological Assessment that described the project.  The Biological Assessment proposed preserving a 5.14-acre parcel owned by the City of Pacifica, to offset negative effects that widening Highway 1 would have on snake and frog habitat.  Relying heavily on this mitigation measure, the Fish and Wildlife Service issued a Biological Opinion signing off on Caltrans' project.  The Biological Opinion also relied on a related mitigation measure, in which Caltrans proposed enhancing a nearby 5.46-acre parcel in the National Park Service's Golden Gate National Recreation Area.

Unfortunately, Caltrans gave bad information to the Fish and Wildlife Service.  The proposed project could not actually have included a commitment to preserve the City of Pacifica's 5.14-acre parcel, because the City already had a legal obligation to preserve that same parcel.  As a result, the Fish and Wildlife Service's assessment of the net effects of the highway-widening and its accompanying mitigation measures was inherently flawed.  Moreover, the other major mitigation measure on which the Fish and Wildlife Service's Biological Opinion relied (enhancement of the 5.46-acre parcel) was too vague and speculative.  For these reasons, the Caltrans and the Fish and Wildlife Service violated the procedural requirements of Endangered Species Act.  Relatedly, because the revelation that the 5.14-acre parcel was already preserved suggests Caltrans' project may affect listed species or their critical habitat to an extent not previously considered by the Fish and Wildlife Service, Caltrans and the Fish and Wildlife Service are required to reinitiate consultation under the Endangered Species Act.

## BACKGROUND

First, a few more words about the area around the proposed construction site.  The stretch of Highway 1 to be widened sits, in part, between two units of the National Park Service's Golden Gate National Recreation Area – Mori Point (on the coast to the west) and Sweeney Ridge (inland to the east).  To the north of the GGNRA property at Mori Point lies Sharp Park Golf Course.  Wetlands near Sharp Park are home to existing populations of California red-legged frogs and San Francisco garter snakes.  The City of Pacifica has a wastewater treatment plant south of the GGNRA property at Mori Point, just west of Highway 1.  To the west of the wastewater treatment plant lies a 5.14-acre parcel also owned by the City.  This 5.14-acre parcel will be relevant later, because Caltrans proposed preserving it to make up for harm that widening Highway 1 would cause to snake and frog habitat.  Caltrans also proposed enhancing a 5.46-acre GGNRA parcel, stretching north in a narrow corridor from the 5.14-acre City property towards Sharp Park, to make it more attractive snake and frog habitat.  This would apparently encourage snakes and frogs to move between the preserved 5.14-acre parcel and their habitat near Sharp Park.



    Caltrans plays two roles with respect to the proposed project.  Most obviously, as a state transportation agency, Caltrans is responsible for planning and implementing the actual widening of Highway 1.  But Caltrans has also assumed certain responsibilities of the Federal Highway Administration, which is an entity of the federal Department of Transportation.  Federal law allows the Department of Transportation to assign its duties under federal environmental laws to state agencies, 23 U.S.C. § 327(a)(2)(A)-(B), and accordingly the Federal Highway Administration assigned its federal environmental-law duties to Caltrans.  Because Caltrans stands in the shoes of the Federal Highway Administration for purposes of federal environmental law, Caltrans is subject to statutes – for example, section 7 of the Endangered Species Act and the Administrative Procedure Act – that only apply to federal agencies.  Caltrans' highway widening project relies on funding or approval from the Department of Transportation, so the Federal Highway Administration (that is, Caltrans performing the role of the Federal Highway Administration) is required to certify that the project complies with relevant federal

environmental laws.

Consistent with the obligations it assumed from the Federal Highway Administration, Caltrans evaluated whether widening Highway 1 was consistent with numerous federal environmental laws.  In particular, under section 7 of the Endangered Species Act, Caltrans engaged in formal consultation with the Fish and Wildlife Service about the project's effects on listed species and their critical habitat.  After Caltrans gave the Fish and Wildlife Service a Biological Assessment describing the project, the Fish and Wildlife Service produced a Biological Opinion concluding that the project Caltrans had described would not jeopardize listed species.  Caltrans also prepared a separate Environmental Assessment and, consistent with the National Environmental Policy Act, made a "Finding of No Significant Impact" – obviating the need to prepare a full Environmental Impact Statement.  Ultimately, Caltrans announced (again, standing in the shoes of the Federal Highway Administration), that the project had been approved under the Endangered Species Act, the National Environmental Policy Act, section 4(f) of the Department of Transportation Act, and other environmental laws.  Notice of Final Federal Agency Actions on Proposed Highway in California, 79 Fed. Reg. 73,390, 73,391 (Dec. 10, 2014).

Three organizational plaintiffs – Pacificans for a Scenic Coast, Pacificans for Highway 1 Alternatives, and the Center for Biological Diversity – now oppose Caltrans' project in this litigation.  Pacificans for a Scenic Coast works "to protect, preserve, and restore the scenic coastal environs within the City of Pacifica and beyond."  Dkt. No. 99-2, Loeb decl., ¶9. Pacificans for Highway 1 Alternatives exists specifically to oppose Caltrans' proposed widening of Highway 1.  Dkt. No. 99-3, Shoemaker decl., ¶7.  The Center for Biological Diversity is an environmentalist group that works "to protect endangered species and wild places through science, policy, education, and environmental law."  Complaint ¶15.  Together, these plaintiffs have brought seven claims against Caltrans and the Fish and Wildlife Service: three Endangered Species Act claims against Caltrans (their first, second, and third claims), an Administrative Procedure Act claim against the Fish and Wildlife Service that is predicated on alleged violations

of the Endangered Species Act (their fifth claim), and three Administrative Procedure Act claims against Caltrans (their fourth, sixth and seventh claims).  These last three APA claims against Caltrans are predicated on violations of the National Environmental Policy Act, the Coastal Zone Management Act, and section 4(f) of the Department of Transportation Act, respectively.[1]

The plaintiffs' Endangered Species Act claims against Caltrans and their APA claim against the Fish and Wildlife Service are all conceptually related.  In their first claim, the plaintiffs allege that Caltrans breached its section 7 duty to consult adequately with the Fish and Wildlife Service, because (among other things) Caltrans' Biological Assessment did not accurately describe the proposed project.  The plaintiffs' fifth claim alleges that, in part because of these flaws in the information that Caltrans gave the Fish and Wildlife Service, the Service produced an invalid Biological Opinion.  Separately, the plaintiffs' third and fifth claims allege that both Caltrans and the Fish and Wildlife Service are required to reinitiate section 7 consultation, because new information has come to light about the project and its net environmental effects since the Biological Opinion was completed.  And the plaintiffs' second claim alleges that these procedural violations threaten to cause substantive harm to listed species and their habitat.

## LEGAL FRAMEWORK

### I.   ENDANGERED SPECIES ACT-RELATED CLAIMS

Section 7 of the Endangered Species Act, 16 U.S.C. § 1536(a)(2), gives rise to two separate obligations.  Procedurally, section 7 requires federal agencies authorizing, funding, or carrying out actions that may affect listed species or their critical habitat – so-called "action agencies" – to engage in consultation with either the Fish and Wildlife Service (which administers the Endangered Species Act with respect to terrestrial and freshwater species) or the National Marine Fisheries Service (which administers the Endangered Species Act with respect to marine species).  Substantively, the action agency has an obligation to ensure that its action

---

[1] Each of the plaintiffs' claims against Caltrans is also brought against its director, Malcolm Dougherty.  For convenience, this ruling will describe these claims as claims against "Caltrans."

will not jeopardize a listed species or its critical habitat.  *See Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1227 (9th Cir. 2008).

Since most of the plaintiffs' Endangered Species Act-related claims concern the procedural duty to consult with the Fish and Wildlife Service, it is worth briefly outlining how the section 7 consultation process works.  Although consultation can sometimes be completed informally, *see* 50 C.F.R. § 402.13, many proposed agency actions – like Caltrans' project in this case – require "formal" consultation.  In formal consultation, the action agency (here, Caltrans) typically provides the Fish and Wildlife Service with a Biological Assessment, which "evaluate[s] the potential effects of the action on listed and proposed species and designated and proposed critical habitat." *Id.* § 402.12(a).  In practice, the Biological Assessment typically also includes a wide range of other information – for example, "[a] description of the action to be considered" and "[a] description of the specific area that may be affected by the action" – that the action agency is required to share with the Fish and Wildlife Service under 50 C.F.R. 402.14(c).

After reviewing the action agency's Biological Assessment, the Fish and Wildlife Service prepares a Biological Opinion.  The Biological Opinion is "a written statement setting forth the [Fish and Wildlife Service's] opinion, and a summary of the information of the information on which it is based, detailing how the agency action affects the species or its critical habitat."  16 U.S.C. § 1536(b)(3)(A).  If the Biological Opinion concludes that the action agency's proposed project will not jeopardize a listed species or adversely modify a listed species' habitat, no modification of the project is necessary.  Otherwise, the Biological Opinion will suggest "reasonable and prudent alternatives" to the project that would be consistent with the action agency's substantive obligation to avoid jeopardizing a listed species or adversely modifying critical habitat.  *Id.*

The Biological Opinion serves as the Fish and Wildlife Service's de facto approval of the action agency's proposed project.  "The action agency is technically free to disregard the Biological Opinion and proceed with its proposed action, but it does so at its own peril (and that of its employees), for 'any person' who knowingly 'takes' an endangered or threatened species is

subject to substantial civil and criminal penalties, including imprisonment." *Bennett v. Spear*, 520 U.S. 154, 170 (1997) (citing 16 U.S.C. § 1540(a)-(b)).  The Endangered Species Act's prohibition on "take" of a listed species includes a wide range of conduct, including mere "harm" to a listed species, 16 U.S.C. § 1532(19), so proceeding without the protection of a Biological Opinion is a very risky proposition.  Conversely, if the action agency proceeds in accordance with a valid Biological Opinion (including an accompanying document called an Incidental Take Statement), it is immunized from criminal and civil liability for "taking" listed species, because "any taking that is in compliance with the terms and conditions specified in a [Biological Opinion] shall not be considered to be a *prohibited* taking of the species concerned."  16 U.S.C. § 1536(o)(2) (emphasis added).

Formal consultation ends when the Fish and Wildlife Service issues its Biological Opinion.  50 C.F.R. § 402.14(l)(1).  Events after the issuance of a Biological Opinion, however, can trigger a duty to reinitiate formal consultation.  *Id.* § 402.16.  Most relevant here, agencies must reinitiate consultation "[i]f new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered."  *Id.* § 402.16(b).

Private plaintiffs can enforce the Endangered Species Act through a citizen-suit provision.  16 U.S.C. § 1540(g)(1).  Notwithstanding this provision, Endangered Species Act claims challenging the Fish and Wildlife Service's enforcement of the Act must be brought under the Administrative Procedure Act.  *Bennett*, 520 U.S. at 174-77.  But lawsuits to enforce the Endangered Species Act can be brought directly "against regulated parties—both private entities and Government agencies," *id.* at 173, so other government agencies can be sued directly under the Act's citizen-suit provision, *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495–96 (9th Cir. 2011).  In fact, because the Administrative Procedure Act applies only where "there is no other adequate remedy in a court," 5 U.S.C. § 704, Endangered Species Act claims against other government agencies *must* be brought directly under the Act's citizen-suit provision, rather than the APA.  *Kraayenbrink*, 632 F.3d at 497.  Nevertheless, even when a claim is brought

directly under the Endangered Species Act's citizen-suit provision, the APA's "arbitrary and capricious" standard of review applies. *Id.* at 496.

## II.   OTHER CLAIMS

The plaintiffs also bring claims under the National Environmental Policy Act, the Coastal Zone Management Act, and section 4(f) of the Department of Transportation Act.  Unlike the Endangered Species Act, these statutes do not contain their own citizen-suit provisions, so the plaintiffs can only bring these claims under the APA.

"The National Environmental Policy Act has twin aims.  First, it places upon a federal agency the obligation to consider every significant aspect of the environmental impact of a proposed action.  Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1066 (9th Cir. 2002).  "NEPA does not contain substantive environmental standards," but instead creates "procedures that require agencies to take a 'hard look' at environmental consequences." *Id.*  In particular, the agency must prepare a document called an Environmental Assessment – "a concise public document" that, relevant here, "[b]riefly provide[s] sufficient evidence and analysis for determining whether" a project will have significant environmental impacts.  40 C.F.R. § 1508.9(a).  If the Environmental Assessment reveals that a project will have significant environmental impacts, the agency is required to prepare a more elaborate document called an Environmental Impact Statement. *Kern*, 284 F.3d at 1067; *see* 40 C.F.R. § 1501.4.  "If the [Environmental Assessment] reveals no significant effect, the agency may issue a Finding of No Significant Impact" instead. *Kern*, 284 F.3d at 1067.

The Coastal Zone Management Act requires federal agencies taking action that affects a state's "coastal zone" to work to ensure that their actions are consistent with the state's own plan for managing its coastal zone.  Section 4(f) of the Department of Transportation Act prohibits the Department of Transportation from approving most transportation projects that "use" public parkland, unless the Secretary of Transportation certifies that "there is no prudent and feasible

alternative to using that land" and the project "includes all possible planning to minimize harm to the park[land]."  49 U.S.C. § 303(c).

# DISCUSSION

## I.   ENDANGERED SPECIES ACT-RELATED CLAIMS

### A.      The Biological Assessment and Biological Opinion

The plaintiffs contend that the Biological Assessment that Caltrans submitted to the Fish and Wildlife Service did not accurately describe Caltrans' proposed project.  And they contend that because Fish and Wildlife Service relied on the faulty Biological Assessment to craft its Biological Opinion, the Biological Opinion is invalid.

#### 1.   Caltrans' Biological Assessment

##### a.   Final Agency Action

Caltrans suggests in passing that its Biological Assessment is not reviewable because a Biological Assessment is not final agency action.  In making this argument, Caltrans assumes that the APA's "final agency action" requirement applies to claims brought directly under the Endangered Species Act's citizen-suit provision.  Some courts have made the same assumption. *See, e.g.*, *Or. Nat'l Desert Ass'n v. Tidwell*, 716 F. Supp. 2d 982, 995 (D. Or. 2010).  But there is some reason to doubt whether this assumption is correct.  The APA's "final agency action" requirement is a product of that statute, 5 U.S.C. § 704, and claims brought under the Endangered Species Act's citizen-suit provision are not subject to the APA, *Kraayenbrink*, 632 F.3d at 495–97, so there is no obvious reason that claims brought under the Endangered Species Act's citizen-suit provision should be subject to the APA's "final agency action" requirement. Therefore, it may be that the APA's "final agency action" requirement does not apply in Endangered Species Act citizen-suit cases.  *See Forest Serv. Emps. for Envtl. Ethics v. U.S. Forest Serv.*, 397 F. Supp. 2d 1241, 1255 (D. Mont. 2005); *Nat'l Wildlife Fed'n v. Fed. Emergency Mgmt. Agency*, 345 F. Supp. 2d 1151, 1160 (W.D. Wash. 2004); *Inst. For Wildlife Prot. v. Norton*, 303 F. Supp. 2d 1175, 1180 (W.D. Wash. 2003), *aff'd*, 149 F. App'x 627 (9th Cir. 2005) (unpublished).

But even if Endangered Species Act citizen suits were subject to the APA's "final agency action" requirement, Caltrans' Biological Assessment would be reviewable.  Under the APA's "final agency action" requirement, "[a] preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action."  5 U.S.C. § 704.  In other words, even under the APA's "final agency action" requirement, Caltrans' Biological Assessment could be included in review of any final agency action stemming from it. And for reasons that will become clear in a moment, Caltrans has taken final agency action stemming from the Biological Assessment.

Recall that Caltrans plays two roles with respect to the proposed project.  Caltrans, acting on its own behalf as a state transportation agency, is responsible for widening Highway 1. Separately, Caltrans – acting on behalf of the Federal Highway Administration – is responsible for approving Caltrans' widening of Highway 1, for purposes of federal environmental laws.  The fact that Caltrans has assumed the role of the Federal Highway Administration (a federal agency) is the reason that Caltrans is subject to Endangered Species Act section 7 (which applies only to federal agencies) in the first place: having assumed the role of the Federal Highway Administration, Caltrans has an obligation to ensure that any action "authorized" or "funded" by the Federal Highway Administration complies with the Endangered Species Act.  16 U.S.C. § 1536(a)(2).  When it comes to Caltrans' obligations under section 7, the relevant action agency is Caltrans in its capacity as the Federal Highway Administration, not Caltrans in its capacity as Caltrans.

In its capacity as the Federal Highway Administration, Caltrans has taken final agency action stemming from the Biological Assessment: it gave final environmental approval to the project.  Notice of Final Federal Agency Actions on Proposed Highway in California, 79 Fed. Reg. 73,390 (Dec. 10, 2014).  This includes approval under the Endangered Species Act.  *Id.* at 73,391.  And consistent with the Federal Register notice's self-description as "final" agency action, this environmental approval is undoubtedly "final" within the meaning of the APA.  It "mark[s] the consummation of the agency's decisionmaking process," *Bennett*, 520 U.S. at 178,

in that it marks the Federal Highway Administration's (that is, Caltrans-as-the-Federal Highway Administration's) final decision that authorizing or funding the project is consistent with federal environmental laws.  And the environmental approval is obviously an act from which "legal consequences will flow," *id.*, because it allows the Federal Highway Administration (again, Caltrans in the role of the Federal Highway Administration) to authorize and fund Caltrans' project.  In fact, if the plaintiffs had not challenged Caltrans' environmental approval by May 11, 2015, any challenge to the project under the relevant environmental laws would likely have been time-barred.  79 Fed. Reg. at 73,391; *see* 23 C.F.R. § 771.139.

Of course, Caltrans still has other action it needs to take in its capacity as a state transportation agency.  In particular, Caltrans would need to obtain three permits (from the California Coastal Commission, the Regional Water Quality Control Board, and the City of Pacifica) and funding from two sources (the San Mateo County Transportation Authority and the State Transportation Improvement Program) before it could widen Highway 1.  Final Environmental Impact Report/Environmental Assessment, vol. 1, lxxxiii (Caltrans AR 523).  But these contingencies don't detract from the finality of the Federal Highway Administration's (that is, Caltrans-as-the-Federal Highway Administration's) approval of construction under federal environmental laws.  Caltrans, having granted environmental approval to the project, has already done everything it needs to do in its capacity as the Federal Highway Administration.

### b.  Merits

The plaintiffs identify several alleged discrepancies between the project Caltrans described in the Biological Assessment and the project Caltrans described in other documents after the Biological Assessment was submitted.  Not "every modification of or uncertainty in a complex and lengthy project" implicates the Endangered Species Act.  *Conservation Cong. v. Finley*, 774 F.3d 611, 619 (9th Cir. 2014).  And most of the discrepancies (to the extent they are real at all) are inconsequential, and do not amount to a violation of the Endangered Species Act.  Nevertheless, one discrepancy – concerning whether Caltrans' project includes a proposed mitigation measure to offset adverse effects on listed species and their habitat – is significant

11

enough to fatally undermine the Biological Assessment.

Caltrans' Biological Assessment recognized that widening Highway 1 would have adverse impacts on habitat for California red-legged frogs and San Francisco garter snakes: 6.61 acres would be "permanently impacted" (and apparently destroyed), and an additional 2.95 acres would "be temporarily impacted during construction activities." Biological Assessment at 73 (Caltrans AR 2888). "To offset these impacts," *id.*, the Biological Assessment "propose[d] compensatory mitigation." *Id.* at xvi (Caltrans AR 2799). It explained that, as part of the project, "[a]n approximately 5.14-[acre] site owned by the City of Pacifica will be preserved in perpetuity." *Id.* This 5.14-acre parcel, west of the City's wastewater treatment plant, is adjacent to a 5.46-acre parcel in the National Park Service's Golden Gate National Recreation Area. The 5.46-acre GGNRA parcel, which forms a narrow corridor stretching north from the 5.14-acre parcel, would be "enhanced" to make it more attractive habitat for frogs and snakes, and would connect the frog and snake habitat on the preserved 5.14-acre parcel to other frog and snake habitat – home to populations of snakes and frogs – near Sharp Park Golf Course to the north.

The Fish and Wildlife Service's Biological Opinion relied significantly on the Biological Assessment's description of Caltrans' proposed mitigation. The Biological Opinion described ways in which widening Highway 1 "will likely adversely affect the California red-legged frog and San Francisco garter snake," Biological Opinion at 23 (FWS AR 515), and determined "that the permanent and temporary loss and/or degradation of California red-legged frog and San Francisco garter snake habitat is likely to result in take of individuals within the action area," *id.* at 25 (FWS AR 517). Nevertheless, the Biological Opinion was satisfied that "Caltrans has proposed a habitat compensation measure to minimize the effects of harm . . . by preserving 5.14 acres in a conservation easement and enhancing 5.46 acres of habitat adjacent to the action area." *Id.*

But contrary to Caltrans' Biological Assessment, preservation of the 5.14-acre parcel could not be considered a new mitigation measure that was part of the project: the City of Pacifica, which owns the parcel, was already required to preserve it for reasons outside the scope

of Caltrans' project.  In 1996, the City sought a permit from the California Coastal Commission to build a wastewater treatment plant between the 5.14-acre parcel and Highway 1.  The California Coastal Commission issued the permit, but imposed a condition (in the form of a deed restriction) that the City forever preserve an area that included the 5.14-acre parcel.  Dkt. No. 86-9 at 1-7; Dkt. No. 86-5 at 5; *see also* Caltrans AR 9133.

Caltrans argues that this does not matter, because the 5.14-acre parcel will be preserved no matter what – either as part of its own project, or under the City of Pacifica's prior obligation.  But, as the Fish and Wildlife Service (the expert agency) agreed at oral argument, a Biological Opinion assesses the net effect of the overall project, which includes not only adverse effects but also mitigation measures designed to offset them.  If a mitigation measure is not actually part of the project, the net effect of the project changes.  If a benefit is not actually being provided to offset a cost (because the benefit would exist regardless), then the overall cost of the project is higher than assumed.  In other words, the project description that Caltrans gave the Fish and Wildlife Service would not be accurate unless the parcel were preserved as part of Caltrans' own project, because "[the] description of the action to be considered," 50 C.F.R. § 402.14(c)(1), "includes any conservation measures proposed as part of the action," U.S. FISH & WILDLIFE SERV. & NAT'L MARINE FISHERIES SERV., ENDANGERED SPECIES CONSULTATION HANDBOOK: PROCEDURES FOR CONDUCTING CONSULTATION AND CONFERENCE ACTIVITIES UNDER SECTION 7 OF THE ENDANGERED SPECIES ACT 4-19 (1998).

This is borne out by the language of the documents in this case.  Both the Biological Assessment and the Biological Opinion relied not only on the fact that the 5.14-acre parcel would be preserved, but also on the assumption that preservation of the parcel would be a new benefit.  The Biological Assessment describes preservation of the parcel as "compensatory," Biological Assessment at xvi (Caltrans AR 2799), "[t]o offset" the project's other negative effects, *id.* at 73 (Caltrans AR 2888).  The Biological Opinion, likewise, described preservation of the parcel as "compensation" for other adverse impacts.  Biological Opinion at 25 (FWS AR 517).  Preservation of the 5.14-acre parcel was supposed to be a new, positive effect that the

project would have on listed species and their habitat, to make up for the project's other, negative effects.

It bears repeating that these are procedural claims, not substantive ones.  The purpose of a procedural claim under the Endangered Species Act is not to measure the actual effect of a proposed action on a species or its habitat, but to make sure that the agencies' decision-making process on that question was not arbitrary and capricious.  It may well be that the Fish and Wildlife Service could re-analyze Caltrans' project with the understanding that the 5.14-acre parcel is already preserved, and still come to a similar conclusion about the project's overall effects on listed species.  But Caltrans' project description was arbitrary and capricious because it ignored "an important aspect of the problem" – the fact that the 5.14-acre parcel was already preserved.  *Kraayenbrink*, 632 F.3d at 493.  This resulted in a faulty Biological Opinion, which in turn resulted in an invalid approval of the project under the Endangered Species Act by Caltrans (standing in the shoes of the Federal Highway Administration).  The plaintiffs are therefore entitled to a declaration that Caltrans breached its procedural obligations under section 7 of the Endangered Species Act.

### 2.  The Fish and Wildlife Service's Biological Opinion

A harder question is whether the Fish and Wildlife Service's Biological Opinion also violates the procedural requirements of the Endangered Species Act (and therefore the APA).  In other words, it is clear that the Biological Opinion has been rendered useless by the bad information upon which it relied, but did the Fish and Wildlife Service also violate the Endangered Species Act by issuing it?  The Fish and Wildlife Service takes the position that "the Service, as the consulting agency, is 'entitled to rely upon the official representations' of Caltrans as set forth in its biological assessment," at least where Caltrans' description of its proposed action is concerned.  That makes some sense.  Unlike the Fish and Wildlife Service, the action agency has complete knowledge of and control over its proposed project.  The action agency also bears the risk of significant inaccuracies in its project description: if the action agency undertakes a project other than the one described in the Biological Opinion, it exposes itself to significant

civil and criminal liability under the Endangered Species Act. *See Bennett*, 520 U.S. at 170.

Thus, as a general matter, it seems likely that Fish and Wildlife Service should be able to rely on

the action agency's description of its proposed project, including any proposed mitigation

measures, at least so long as the Service is not on clear notice that the information is wrong. *See*

*Defs. of Wildlife v. U.S. Fish & Wildlife Serv.*, No. 16-cv-01993-LHK, 2016 WL 4382604, at *18

(N.D. Cal. Aug. 17, 2016).

But even if the Fish and Wildlife Service could rely on Caltrans' proposed preservation of

the 5.14-acre parcel, there is a separate problem with the mitigation measures the Biological

Opinion approved. A Biological Opinion may not rely on proposed mitigation measures "absent

specific and binding plans" for those mitigation measures. *Nat'l Wildlife Fed'n v. Nat'l Marine*

*Fisheries Serv.*, 524 F.3d 917, 936 (9th Cir. 2008). This requires "a clear, definite commitment

of resources" toward those mitigation measures. *Id.* Mitigation measures that "are conceptual in

nature only" do not qualify. *Ctr. for Biological Diversity v. Salazar*, 804 F. Supp. 2d 987, 1002

(D. Ariz. 2011) (Tashima, J.). Here, the Biological Opinion relied on a proposed mitigation

measure – enhancement of the 5.46-acre GGNRA parcel – that was admittedly "conceptual."

Caltrans' Biological Assessment told the Fish and Wildlife Service that "GGNRA staff has

approved this mitigation proposal in concept" only, and that "details will need to be worked out

to reach an agreement on the mitigation plan with the [National Park Service] and develop an

enhancement plan." Biological Assessment at 73 (Caltrans AR 2888).

The Fish and Wildlife Service argues that the plans to enhance the 5.46-acre GGNRA

parcel were sufficiently "binding" because the Biological Opinion itself conditioned its approval

of Caltrans' project on the project's proposed mitigation measures. There are a few problems

with this argument. First, even if the plan to enhance the 5.46-acre parcel were "binding," it is

still not clear (given its conceptual nature and conceded lack of detail) that it could be

sufficiently "specific." Second, the purportedly "binding" nature of the proposed mitigation

measure stems from their inclusion in the terms and conditions implementing the "reasonable

and prudent alternatives" required by the Biological Opinion's Incidental Take Statement. *See*

Biological Opinion at 29 (FWS AR 521).  In fact, however, it is not clear that the Fish and Wildlife Service should have included the proposed mitigation in the Incidental Take Statement at all.  "[O]nly those measures that *minimize* a project's incidental takings are properly included in an Incidental Take Statement's terms and conditions."  *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1114 n.9 (9th Cir. 2012) (emphasis in original).  "[T]he objective of the incidental take analysis under section 7 is minimization, not mitigation," which means that, "[i]f the conservation measure only protects off-site habitat and does not minimize impacts to affected individuals in the action area, the beneficial effects of the conservation measure are irrelevant to the incidental take analysis."  ENDANGERED SPECIES CONSULTATION HANDBOOK 4-19.  Here, the point of enhancing the 5.46-acre GGNRA parcel was not to minimize harm to snakes and frogs within Caltrans' construction site, but to compensate for harm within Caltrans' construction site by creating a new benefit outside it.

Third, it seems doubtful that a Biological Opinion's Incidental Take Statement can create "binding" commitments in the sense that the Ninth Circuit requires.  The purpose of requiring "binding plans" for mitigation measures is to ensure that they are "reasonably certain to occur."  *Nat'l Wildlife Fed'n*, 524 F.3d at 936 & n.17.  This suggests that mitigation plans should be "binding" on the agency that would actually need to implement them, not merely on the action agency.  The Ninth Circuit's decision in *Sierra Club v. Marsh* is instructive.  In *Marsh*, as here, the proposed mitigation was "one of several 'reasonable and prudent alternatives' that the FWS found necessary to minimize the project's effects."  816 F.2d 1376, 1388 (9th Cir. 1987), *abrogated on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008), *and Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010), *as recognized in Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1088-91 (9th Cir. 2015).  But this was not enough to make a proposed mitigation measure reasonably certain to occur: the proposed mitigation measure in *Marsh* did not, in fact, occur.  *See* 816 F.2d at 1380-81, 1386-89.

Finally, even if the plan to enhance the 5.46-acre GGNRA parcel were otherwise sufficiently "binding" and "specific," it would still have needed "a clear, definite commitment of

resources." *Nat'l Wildlife Fed'n*, 524 F.3d at 936.  There is no evidence that the National Park Service has committed any resources to enhancement of the 5.46-acre parcel.  On the contrary, Caltrans and the National Park Service still need to "reach an agreement on the mitigation plan" and "develop an enhancement plan."  Biological Assessment at 73 (Caltrans AR 2888).  In the absence of any concrete plan for the enhancement of the GGNRA parcel, it seems unlikely that the National Park Service has secured the approval or funding that "a clear, definite commitment of resources" requires.

If "agencies lack the power to guarantee the improvements in question," then "the proper course is to exclude them from the analysis and consider only those actions that are in fact under agency control or otherwise reasonably certain to occur." *Nat'l Wildlife Fed'n*, 524 F.3d at 936 n.17.  Because the Biological Opinion relied on a vague and speculative mitigation measure that was not under Caltrans' control, it violated the Endangered Species Act.  The plaintiffs are therefore entitled to a declaration that the Biological Opinion violated the Administrative Procedure Act.

### B.     Reinitiation of Consultation

#### 1.   Ripeness

Caltrans argues that the plaintiffs' claims concerning the reinitiation of section 7 consultation are not ripe, because Caltrans will decide whether to reinitiate consultation "before final approvals are obtained and before construction can begin."  But the idea that the plaintiffs have to wait until Caltrans is ready to begin construction before seeking declaratory relief "rest[s] on the false premise that [the plaintiffs are] pursuing a substantive ESA claim." *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1084 (9th Cir. 2015).  The plaintiffs' reinitiation-of-consultation claims are based not on substantive harm to the environment, but on procedural injury – "that [Caltrans] failed to comply with the procedural requirements of the ESA when it declined to reinitiate consultation." *Id.* "When a party . . . suffers a procedural injury, it 'may complain of that failure at the time the failure takes place, for the claim can never get riper.'" *Id.* (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*,

523 U.S. 726, 737 (1998)).  *Cottonwood* rejects Caltrans' theory that the plaintiffs cannot

challenge a procedural violation of the Endangered Species Act until the defendant begins

implementing a specific project: "The imminence of project-specific implementation is irrelevant

to the ripeness of an action raising a procedural injury."  *Id.*  As long as "the alleged procedural

violation—failure to reinitiate consultation—is complete, so too is the factual development

necessary to adjudicate the case."  *Id.*  Although Caltrans' arguments about the uncertain future

of the project are (as discussed later) relevant to the plaintiffs' ability to obtain a particular form

of relief (namely, injunctive relief), they not relevant to the overall justiciability of the plaintiffs'

claims.

      If there were any doubt that the plaintiffs' reinitiation-of-consultation claims are ripe, it

would be resolved by the fact that Caltrans has engaged in final agency action on behalf of the

Federal Highway Administration by giving environmental approval to the project.  Agency

action that is "final" within the meaning of the Administrative Procedure Act is necessarily ripe

in a constitutional and prudential sense.  The ripeness inquiry considers "(1) whether delayed

review would cause hardship to the plaintiffs; (2) whether judicial intervention would

inappropriately interfere with further administrative action; and (3) whether the courts would

benefit from further factual development of the issues presented."  *Ohio Forestry Ass'n*, 523 U.S.

at 733.  Once final agency action has taken place, judicial intervention cannot inappropriately

interfere with further administrative action, because the relevant administrative action is over.

Likewise, there is no further factual development relevant to the final agency action that's being

challenged – the agency, having made a final decision, has closed the administrative record on

which that decision was based.  And because final agency action typically (as in this case) starts

the clock on time bars to judicial review, delayed review would cause hardship to the plaintiffs.

### 2.  Mootness

      Caltrans' arguments about ripeness could also implicate mootness, a jurisdictional issue

that the Court must consider even though Caltrans has not explicitly raised it.  *Shell Offshore,*

*Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1286 (9th Cir. 2013).  If it were clear that Caltrans'

proposed project will not occur, any procedural flaws underlying the project's approval would probably be irrelevant.  But that could only be the case if it were "absolutely clear" that the project would not proceed, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).  Although Caltrans now states that the project is "on the shelf" and "may" never go forward, there is no evidence Caltrans has made the kind of unequivocal decision to scrap the project that could give rise to mootness, *see Bell v. City of Boise*, 709 F.3d 890, 899-901 (9th Cir. 2013).  For example, Caltrans has not sought to withdraw or vacate the Federal Register notice announcing the project's environmental approvals.  Nor has Caltrans formally notified the Fish and Wildlife Service that the project it presented in its Biological Assessment will not proceed.  *See* 50 C.F.R. § 402.14(*l*)(2).  Perhaps Caltrans could have mooted the case by doing any of these things.  Instead, however, Caltrans merely argues that the project's future is uncertain, and mere uncertainty cannot render this case moot.

To the extent Caltrans means to argue that a declaratory judgment on reinitiating consultation would require the agencies to waste resources continuing to consult on a project that may not go forward, there are two responses.  First, Caltrans would not necessarily be required to reinitiate consultation immediately, without regard for the status of the rest of the project.  Section 7 prohibits federal agencies from "authoriz[ing], fund[ing], or carr[ying]" out relevant actions without engaging in consultation, 16 U.S.C. § 1536(a)(2).  This means Caltrans must certainly reinitiate consultation before it moves to reissue any environmental approval for the project on behalf of the Federal Highway Administration, but before then, new consultation might "serve no purpose."  *Cf. Tinoqui-Chalola Council of Kitanemuk & Yowlumne Tejon Indians v. U.S. Dep't of Energy*, 232 F.3d 1300, 1308 (9th Cir. 2000).  Second, even if Caltrans were to reinitiate consultation immediately, it could end that process just as quickly.  If Caltrans' project truly is not likely to occur, Caltrans may discharge its consultation duty by informing the Fish and Wildlife Service of this fact in writing.  *See* 50 C.F.R. § 402.14(*l*)(2).  Of course, this will mean Caltrans will not have completed a valid section 7 consultation for the project (and, consequently, won't have obtained a valid Biological Opinion or issued a valid approval notice

on behalf of the Federal Highway Administration).  But it would not need those things if it decided to keep the project on the shelf.

### 3.  Caltrans' Duty to Reinitiate Consultation

Where, as here, federal agencies' authority over a proposed action involves discretionary rather than mandatory duties, reinitiation of section 7 consultation is required "[i]f new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered."  50 C.F.R. § 402.16(b).  New information – the revelation that the City of Pacifica's 5.14-acre parcel was already required to be preserved – has indicated that widening Highway 1 may affect listed species and their habitat to an extent not previously considered.  Caltrans relied on preservation of the 5.14-acre parcel to compensate for other adverse effects to listed species and their habitat.  The loss of this benefit necessarily implies that the project's net effect on listed species and their habitat will be greater than previously thought.  *Cf. Marsh*, 816 F.2d at 1388.  The plaintiffs are therefore entitled to a declaration that Caltrans has a duty to reinitiate consultation under section 7 of the Endangered Species Act.[2]

Caltrans could have avoided this duty to reinitiate consultation, of course, by ensuring that its initial consultation with the Fish and Wildlife Service was adequate.  By August 2011, when the Service's Biological Opinion was still in its draft stage, Caltrans was aware that the 5.14-acre City of Pacifica parcel "was already spoken for by the City for a previous requirement."  Caltrans AR 7516.  Caltrans should have shared this information with the Fish and Wildlife Service, to ensure that the Biological Opinion – which was not finalized until January 2012 – accurately reflected the mitigation measures included in Caltrans' project.  Having caused the Fish and Wildlife Service to issue a flawed Biological Opinion, Caltrans has

---

[2] The fact that Caltrans' project will not include its proposed preservation of the 5.14-acre parcel might also implicate 50 C.F.R. § 402.16(c), which requires reinitiation of consultation "[i]f the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion."  *See Ctr. for Biological Diversity*, 698 F.3d at 1114-15.

only itself to blame for the fact it must reinitiate consultation and obtain a new Biological Opinion before approving the project again for the Federal Highway Administration. *Cf. Or. Nat. Desert Ass'n*, 716 F. Supp. 2d at 1004.

### 4. The Fish and Wildlife Service's Duty to Reinitiate Consultation

Notwithstanding Caltrans' duty to reinitiate consultation, the Fish and Wildlife Service argues it can have no duty to reinitiate consultation, because that duty lies solely with the action agency. That's true of the duty to initiate formal consultation in the first place, *Defs. of Wildlife v. Flowers*, 414 F.3d 1066, 1070 (9th Cir. 2005), but it's not true of the duty to reinitiate consultation. The regulation requiring reinitiation of consultation describes the Fish and Wildlife Service's obligation in the same terms as the action agency's obligation: "Reinitiation of formal consultation . . . shall be requested by the Federal agency or by the Service." 50 C.F.R. § 402.16. Consistent with the plain text of the regulation, the Ninth Circuit has stated that "[t]he duty to reinitiate consultation lies with both the action agency and the consulting agency." *Salmon Spawning*, 545 F.3d at 1229.

The Fish and Wildlife Service also argues that "50 C.F.R. § 402.16 contains no temporal requirement for reinitiation of consultation," so – given that it is unclear whether Caltrans' project will go forward at all – the Service is not yet in violation of any duty to request the reinitiation of consultation. Unlike Caltrans, the Fish and Wildlife Service seems to frame this as an issue going to the merits rather than ripeness: under the Service's reading of section 402.16, there is simply no duty to reinitiate consultation yet. It's true that the regulation is vague as to time, but it is written using trigger language: "if" any one of four conditions listed in sections (a) through (d) is satisfied, then "[r]einitiation of formal consultation is required." Confirming this view, *Cottonwood* held that an agency "was required to reinitiate consultation when" one of the four trigger conditions (there, the Fish and Wildlife Service's designation of new critical habitat) was satisfied. 789 F.3d at 1088.

As with Caltrans, the Fish and Wildlife Service's compliance with this duty would not be especially burdensome. For example, the Fish and Wildlife Service could presumably satisfy

this duty by simply requesting that Caltrans reinitiate consultation before reauthorizing or funding the project on behalf of the Federal Highway Administration.  The precise timing of new consultation would then be up to Caltrans, because consultation could not move forward until Caltrans sent the Service a new Biological Assessment.

### C.    Injunctive Relief for the Procedural Violations

In addition to declaratory relief establishing that the defendants have violated the Endangered Species Act and have a duty to reinitiate section 7 consultation, the plaintiffs seek injunctive relief actually ordering the defendants to reinitiate consultation and prohibiting them from moving forward with the project until they comply with the Endangered Species Act.  The mere fact that Caltrans and the Fish and Wildlife Service have violated the procedural requirements of the Endangered Species Act, however, does not entitle the plaintiffs to an injunction.  In addition to prevailing on the merits of a claim, "[a] plaintiff seeking a permanent injunction must" show "that it has suffered an irreparable injury" (that is, injury for which money damages are an inadequate remedy) – or, at least, that it "will suffer irreparable injury" in the absence of injunctive relief.  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156, 162 (2010); *see also Cottonwood*, 789 F.3d at 1091.  Mere violation of the Endangered Species Act's procedural requirements, without actual environmental harm, is not irreparable injury.  *See Cottonwood*, 789 F.3d at 1088-92.  Therefore, the procedural violations by Caltrans and the Fish and Wildlife Service entitle the plaintiffs to declaratory relief, but they must show irreparable injury to obtain injunctive relief.

The plaintiffs here allege that widening Highway 1 "would" cause irreparable injury if it went forward, in the form of environmental harm.  Complaint ¶119.  They have not shown that they will suffer irreparable injury in the absence of injunctive relief, however, because there is no evidence that Caltrans will actually go forward with construction in the near future.  On the contrary, as of August 2013, Caltrans' project was not yet funded.  Final Environmental Impact Report/Environmental Assessment, vol. 1, lxxxiii (Caltrans AR 523).  Caltrans represents that the project remains unfunded, and thus cannot currently proceed.  Because it is unclear whether

Caltrans will actually take any action that would affect the environment around the project site in the near future, the plaintiffs cannot show irreparable injury in the form of environmental harm. *Cf. Cottonwood*, 789 F.3d at 1092.

Of course, this analysis would change if Caltrans moved to begin construction without remedying its violations of the Endangered Species Act. Environmental harm is typically irreparable, *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011), and "[i]n light of the stated purposes of the ESA in conserving endangered and threatened species and the ecosystems that support them, establishing irreparable injury should not be an onerous task for plaintiffs," *Cottonwood*, 789 F.3d at 1091. If Caltrans were to proceed with its project in ways that would harm the environment without first remedying its violations of the Endangered Species Act, the plaintiffs could seek an injunction preventing that from happening.

**D.    Substantive Endangered Species Act Claim**

In addition to the procedural claims discussed above, the plaintiffs have one substantive claim under the Endangered Species Act. They allege that "Caltrans and Dougherty have violated their ESA section 7(a)(2) substantive duty" – that is, the duty to ensure that an action will not jeopardize a listed species or its critical habitat – "by approving the Project without ensuring that the Project will not jeopardize the Listed Species' survival or recovery." Complaint ¶69. But nothing that Caltrans has done so far has actually jeopardized a listed species or its critical habitat. Caltrans has approved the project on paper, but (as just noted in connection with the plaintiffs' request for injunctive relief) it has not engaged in any concrete, on-the-ground activity at the project site. There is no sign that this will change in the foreseeable future (particularly now that Caltrans will need to go back and consult again with the Fish and Wildlife Service if it wishes to comply with the Endangered Species Act).

"Whether the question is viewed as one of standing or ripeness," Article III's case-or-controversy requirement demands the existence of actual or imminent injury – not the "imaginary" or "speculative" possibility of future injury. *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000). Because the plaintiffs have no actual or imminent

23

injury underlying their substantive Endangered Species Act claim the Court lacks subject matter jurisdiction over it.[3]

## II.   OTHER CLAIMS

The plaintiffs' three other claims are all brought against Caltrans under the APA.  Each is predicated on the alleged violation of a different environmental statute: the National Environmental Policy Act ("NEPA"), the Coastal Zone Management Act, and section 4(f) of the Department of Transportation Act.  None is meritorious.

### A.  National Environmental Policy Act

The plaintiffs argue that the Environmental Assessment was arbitrary and capricious under NEPA, because it insufficiently described the project and its effect on the local environment.  In particular, they argue that the Environmental Assessment inadequately analyzed the project's impacts on pedestrian safety, wildlife (including California red-legged frogs and San Francisco garter snakes), archaeological and cultural resources, noise levels, and visual aesthetics.  They also argue that the Environmental Assessment did not do enough to analyze construction impacts and cumulative impacts.  Similarly, the plaintiffs contend that the Environmental Assessment inadequately described the presence of public utilities, wetlands, and California red-legged frogs in and around the project area.  But the Environmental Assessment

---

[3] The plaintiffs have Article III standing on their other claims, which are all procedural in nature. "To demonstrate standing to bring a procedural claim . . . a plaintiff must show that the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing."  *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015).  Members of all three plaintiff organizations have submitted declarations establishing their concrete interests in the area's environment and coastal views, which are the kinds of interests that the procedural environmental laws at issue here are designed to protect. Because the plaintiffs' members have established these concrete interests, "the causation and redressability requirements are relaxed," and it is sufficient for the members to show "that they have a procedural right that, if exercised, *could* protect their concrete interests."  *Id.* (emphasis in original).  This requirement is satisfied, because each of the procedural safeguards that the plaintiffs invoke could cause Caltrans (or an agency on which Caltrans depends for approval) to reassess the wisdom of proceeding with the project, and prevent the project from going forward. Accordingly, the organizational plaintiffs' members would have standing.  And because this lawsuit is clearly germane to the plaintiff organizations' interests and nothing requires the individual members' participation in the lawsuit, the organizational plaintiffs have standing too. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

discussed pedestrian safety, local wildlife (including California red-legged frogs and San Francisco garter snakes), archaeological and cultural resources, noise impacts, visual impacts, construction impacts, cumulative impacts, public utilities in the area, and local wetlands.  Final Environmental Impact Report/Environmental Assessment, vol. 1, 81-94, 182-204, 118-24, 158-67, 95-117, 205-10, 211-17, 80, 174-76 (Caltrans AR 628-43, 757-84, 684-90, 727-37, 644-83, 785-90, 791-97, 627, 749-51).  In each case, Caltrans' discussion was detailed – certainly detailed enough for "a concise public document" that"[b]riefly provide[s] sufficient evidence and analysis for determining whether" a project will have significant environmental impacts, 40 C.F.R. § 1508.9(a).  It was also internally consistent and otherwise reasonable.  And in the same vein, although the plaintiffs argue that "Caltrans' decision to prepare a [Finding of No Significant Impact] rather than an [Environmental Impact Statement] violated NEPA," the plaintiffs have not shown that Caltrans' Finding of No Significant Impact (which was supported by the Environmental Assessment) was arbitrary and capricious.

      The plaintiffs also identify several places in which Caltrans refined its description of the project between the public circulation of a Draft Environmental Assessment and publication of the Final Environmental Assessment.  They argue that "where project description details are supplied only in the Final [Environmental Assessment], the public is impermissibly precluded from commenting on the project approved."  But, under NEPA, "the circulation of a draft [Environmental Assessment] is not required in every case" to begin with.  *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 952 (9th Cir. 2008).  If NEPA does not, as a general matter, require circulation of a draft Environmental Assessment at all, it can hardly require an agency to commit to a draft that matches the final version of the document exactly.  NEPA requires only that "[a]n agency, when preparing an [Environmental Assessment], must provide the public with sufficient environmental information, considered in the totality of circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process."  *Id.* at 953.  The detailed Draft Environmental Assessment that Caltrans circulated to the public easily satisfied that standard, and none of the

revisions that Caltrans made to the draft are substantial enough to have significantly affected the public's ability to understand and comment on the project.

One potentially significant revision to the Draft Environmental Assessment concerns, again, the 5.14-acre parcel owned by the City of Pacifica.  The Draft Environment Assessment, like Caltrans' Biological Assessment, referred to plans to "preserve" the 5.14-acre parcel as a mitigation measure.  Draft Environmental Impact Report/Environmental Assessment at xxxvi, 163 (Caltrans AR at 184, 363).  The Final Environmental Assessment, recognizing that the 5.14-acre parcel was already preserved, refers to plans to "enhance" the 5.14-acre parcel.  Final Environmental Impact Report/Environmental Assessment, vol. 1, at xlviii, 197 (Caltrans AR 488, 775).  This distinction matters less for NEPA than it does for the Endangered Species Act, however, because NEPA's mitigation requirements are much less strict than the Endangered Species Act's.  Whereas the Endangered Species Act requires "a clear, definite commitment of resources for future improvements," *Nat'l Wildlife Fed'n*, 524 F.3d at 936, NEPA does not require "that a complete mitigation plan be actually formulated and adopted," *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989).  Because NEPA allows proposed mitigation measures to be general and tentative rather than specific and definite, it does not matter that Caltrans' proposed mitigation could not occur exactly as described in the Draft Environmental Assessment that it circulated to the public.  NEPA requires only "that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated," *id.*, and both the Draft Environmental Assessment and the Final Environmental Assessment adequately conveyed the basic thrust of Caltrans' proposed mitigation plan: the 5.14-acre parcel would provide suitable snake and frog habitat, and would be connected via the 5.46-acre GGNRA parcel to the frog and snake populations near Sharp Park.

### B.    Coastal Zone Management Act

One provision of the Coastal Zone Management Act provides that "Federal agency activity" affecting a state's coastal zone "shall be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of approved State management

programs."  16 U.S.C. § 1456(c)(1)(A).  "Each Federal agency carrying out an activity subject

to" this provision "shall provide a consistency determination to the relevant State agency . . . in

no case later than 90 days before final approval of the Federal activity unless both the Federal

agency and the State agency agree to a different schedule."  *Id.* § 1456(c)(1)(C).  It is undisputed

that Caltrans has assumed the Federal Highway Administration's obligations under the Coastal

Zone Management Act, that Caltrans' project affects California's coastal zone, and that Caltrans

has not submitted a consistency determination to the relevant state agency (the California Coastal

Commission).  This, the plaintiffs contend, means that Caltrans' approval of the project violates

the Coastal Zone Management Act.

But Caltrans has not violated this provision of the Coastal Zone Management Act,

because Caltrans' action is not subject to it in the first place.  This provision applies only to

"Federal agency activity."  *Id.* § 1456(c)(1)(A) .  "'Federal agency activity' does not include the

issuance of a federal license or permit to an applicant or person . . . or the granting of federal

assistance to an applicant agency."  15 C.F.R. § 930.31(a).  The plaintiffs have not shown that

the Federal Highway Administration was responsible for doing anything other than or issuing

licenses and permits or offering federal assistance to Caltrans.  The Federal Highway

Administration's approval of the project under federal environmental laws is a "federal license or

permit," because that term is defined broadly as "any authorization that an applicant is required

by law to obtain in order to conduct activities affecting any land or water use or natural resource

of the coastal zone and that any Federal agency is empowered to issue to an applicant."  15

C.F.R. § 930.51(a).  In fact, the Federal Register notice announcing the project's environmental

approval describes itself as announcing "licenses, permits, and approvals for the project."  79

Fed. Reg. at 73,391.  Because neither federal assistance nor the issuance of federal licenses and

permits are "Federal agency activity" subject to 16 U.S.C. § 1456(c)(1), Caltrans has not violated

the Coastal Zone Management Act.

### C.    Department of Transportation Act

Under section 4(f) of the Department of Transportation Act, transportation projects are

generally prohibited from "using" public parkland (for example, National Park Service land)
absent findings that "there is no prudent and feasible alternative to using that land" and the
project "includes all possible planning to minimize harm to the park[land]."  49 U.S.C. § 303(c).
The plaintiffs argue that Caltrans' project will "use" nearby National Park Service parkland at
Mori Point and Sweeney Ridge, and note that no section 4(f) findings were made with respect to
Mori Point or Sweeney Ridge.  "Use" can include constructive use, 23 C.F.R. § 774.17, so the
undisputed fact that Caltrans' project will not physically occupy any land at Mori Point or
Sweeney Ridge does not conclusively refute the plaintiffs' argument.

But the evidence does not suggest that the project's effects on public parkland would rise
to the level of constructive use – and, more to the point, Caltrans' contrary determination was not
arbitrary and capricious.  "A constructive use occurs when . . . the project's proximity impacts are
so severe that the protected activities, features, or attributes that qualify the property for
protection under Section 4(f) are substantially impaired."  23 C.F.R. § 774.15(a).  "Substantial
impairment," in turn, "occurs only when the protected activities, features, or attributes of the
property are substantially diminished."  *Id.*  The plaintiffs argue that Caltrans' project will
"degrad[e] views" from Mori Point and Sweeney Ridge, "potentially harm[] wildlife (including
protected species) that move to and from this parkland" across the road, and "risk[] spreading
invasive plants into the parkland."  But Caltrans examined the project's potential impacts on
views from Mori Point and Sweeney Ridge, wildlife (including protected species and animals
crossing the road), and invasive plant species, and reasonably determined that these impacts
would not be significant.  *See, e.g.*, Final Environmental Impact Report/Environmental
Assessment, vol. 1, at 111-14, 172, 182-202, 203-04 (Caltrans AR 673-79, 747, 757-82, 783-84).

It does not matter that Caltrans did not make these determinations in a part of the record
specifically devoted to its obligations under section 4(f) of the Department of Transportation Act.
The plaintiffs argue that "the Court must look only to [Caltrans'] Section 4(f) Findings," which
address the project's impact on a bike path on the parkland, Caltrans AR 948.  But Caltrans was
only required to make section 4(f) findings regarding the bike path – that is, that "there is no

prudent and feasible alternative to using" the bike path and the project "includes all possible planning to minimize harm to the" bike path, Caltrans AR 949-50; *see* 49 U.S.C. § 303(c) – because it had already determined that the project's impacts on the bike path would constitute "use" of public parkland.  "[T]he [Federal Highway] Administration is not required to document each determination that a project would not result in a constructive use of a nearby Section 4(f) property," 23 C.F.R. § 774.15(c), so Caltrans (fulfilling the role of the Federal Highway Administration) was not required to record *any* determination that the project's other impacts would not rise to the level of constructive use.  Because Caltrans was not required to create a written record specifically addressing its non-use determination under the Department of Transportation Act, it makes no sense to limit review of this claim to those parts of the record that specifically address the Department of Transportation Act.

## CONCLUSION

For all these reasons, summary judgment is granted to the plaintiffs on their first, third, and fifth claims.  The plaintiffs are entitled to declaratory relief on these claims – specifically, a declaration that: (i) the Biological Assessment was arbitrary and capricious under Endangered Species Act; (ii) the Biological Opinion, having violated the procedural requirements of the Endangered Species Act, was arbitrary and capricious under the APA; (iii) the resulting final environmental approval under the Endangered Species Act by Caltrans (acting as the Federal Highway Administration) was invalid; and (iv) both Caltrans and the Fish and Wildlife Service have a duty to reinitiate section 7 consultation.  The plaintiffs are not, however, entitled to injunctive relief.  Summary judgment is granted to Caltrans on the plaintiffs' fourth, sixth, and seventh claims.  The plaintiffs' second claim is dismissed for lack of subject matter jurisdiction.

**IT IS SO ORDERED.**

Dated: September 2, 2016

_____
VINCE CHHABRIA
United States District Judge